WAYMOND M. BROWN, Judge
Appellant Bradley Wiseman (Brad) appeals from an order of the Marion County Circuit Court declining to admit a June 3, 2015 will to probate. The court found that Brad failed to rebut the presumption that Patsy Malenke was under undue influence at the time she signed the will in question. Brad argues that the court erred by: (1) shifting the burden of proof and employing the wrong standard and (2) finding that he did not meet the burden. We affirm.[1]
Patsy died on June 28, 2015, at the age of 75. At the time of her death, she was survived by three children (Michael Wiseman, Teresa Wiseman Keeter, and Brad Wiseman) and five stepchildren (Brian[2] Malenke, Teri Gisi, Robin Hunsperger, Jacob Schmitt, and Joe Schmitt). Her real and personal property was valued at $152,000,[3] according to the petition to probate Patsy's will filed by Brad on October 22, 2015. The will in question was dated June 3, 2015, and left most of Patsy's estate to Brad. The June 3, 2015 will revoked an earlier will dated July 27, 2010, which left fifty percent of Patsy's estate to be equally divided by her children and the remaining fifty percent to be equally divided by her stepchildren. On November 6, 2015, Patsy's remaining survivors filed a will contest. They alleged that the 2015 will was invalid because it was executed under undue influence or duress and because Patsy was incompetent at the time of the will's execution.
A hearing took place on November 16, 2016. Dr. Gary Linker, a psychiatrist, testified that Patsy was admitted into North Arkansas Medical Center on June 15, 2015, based on a referral from Dr. Richard Chitsey due to hallucination and paranoia. He stated that he met Patsy on June 16 and that although she knew her name, she was unable to provide other basic details regarding her life due to her dementia. According to him, Patsy was very confused, disorganized, and scared throughout her stay at the hospital. He testified that Patsy was administered the St. Louis University Memory Scoring test (SLUMS test), which only required basic information, and that she scored 1 out of 30, which indicated advanced dementia syndrome. He stated that there was also suspicion that Patsy had a stroke. He said that the family history he obtained showed that Patsy's dementia had been progressing *885 over time, but had sped up rapidly. He testified that she was discharged on June 24, 2015, with a very poor prognosis.[4] He opined that at the time of Patsy's discharge, her brain was in "failure mode." He further testified:
I cannot say whether or not she had the capacity to sign a will on June 3rd, as people can have lucid intervals and I had not treated her prior to June 16th. I can say on June 16th when I saw her first, she did not have the capacity to do anything complex. Based on her condition when I first saw her, that perhaps a fall or stroke could have caused her to deteriorate quickly enough to have been fine on June 3rd and then in the condition I saw her in on June 16th. It should be noted that she had an urinary tract infection upon being admitted on June 16th, and any sort of infection coupled with dementia can contribute to dementia and delirium. Also changes in environment can make you more susceptible to delirium. What made me think the signs of dementia were not based on the infection was the severity of the symptoms at the time I saw her.
I could say she was possibly impaired on June 3rd, but I could not say she was totally impaired. People with advance[d] dementia and severely advanced dementia do have the ability to make decisions. Dr. [Geoffrey] Dunaway's prior diagnosis of hallucinations and delusional thoughts would not change my opinion about her status on June 3rd. I worked with a judge who had a stroke and had very similar problems as [Patsy], but then he returned to the bench. Dementia and its symptoms can be very complex. The infection or a fall or something else could render her temporarily incapacitated and then she could be fine again. There is no way to say how she was on a day in which I did not see her, again when I saw her on the 24th, there was no way she could make a complex decision. Her SLUMS exam from February 24, 2014, would not change that opinion, because there are many factors that could have been in play that day. She could have times of being fine and periods of delirium and that is the bottom line. Even if she would have scored a 30 on the SLUMS exam, she could have still been incapable of complex decision close thereafter. In general, as the dementia disease progresses, dependency increases. Removal from familiar environments can cause dependence and confusion. Restriction from family and friends can cause increased dependency. The medications used to treat symptoms of dementia could diminish one[']s mental capacity. Her discharge summary referred to her dementia as chronic, which means had lasted longer than six months.
On cross-examination, Dr. Linker stated that he could not state whether or not Patsy was under undue influence at the time she executed the will in question. He stated that Dr. Chitsey's notes indicated that Patsy had been hallucinating and delusional and that was why she was referred to Dr. Linker's facility. He testified that he had never had a situation where Dr. Chitsey "would have seen a patient whom needed to be referred to [Dr. Linker], but he failed to do so, based on their mental impairment." He admitted that Dr. Chitsey's notes from June 3, 2015, indicated that Patsy was seen by him and was "having a good day." He testified that he learned on the day of the hearing that Dr. Dunaway had diagnosed Patsy with mild vascular dementia. He said that Patsy's condition did not improve while she was *886 hospitalized. He opined that moving a patient in need of help could lead to failure due to the change. He stated that Patsy was given medication to sleep because her lack of sleep was an ongoing issue for her. He indicated that sleep was very important to someone with dementia. Dr. Linker stated that Patsy was in his facility for nine days, but he only spoke with Brad and Brad's wife, Kim, during that time.
On redirect, Dr. Linker stated that a period of hallucinations from February 2014 to May 2015 would be a potential symptom of dementia. However, he stated that cutting up clothing with scissors would be more of a disorganized behavior due to being overwhelmed and confused. He said that the disorganized behavior could wax and wane depending on how well the person slept. He also admitted that disorganized behavior could be a symptom of dementia. He testified that Dr. Chitsey's notes from June 13, 2015, indicated that Patsy's altered mental state had been going on for quite a while and that he took that to mean more than two weeks. He stated, "I have seen people who hallucinate robustly but they have an amazing ability to recall how much money they have and the names of their kids, etc."
On re-cross, Dr. Linker stated that even a lay person would have been able to recognize Patsy's poor mental condition on June 15, 2015.
Whitney Wiseman, Patsy's granddaughter, testified that she began living with Patsy in 2008 after Patsy's second husband passed away. She stated that Patsy lived in the home until May 2015, when she moved in with Brad. She testified that no one discussed Patsy's moving out with either her, her father, or her aunt. She said that Patsy had a mini stroke in February 2014 that changed her. She stated that after the stroke, it was decided that Patsy needed 24-hour care. Whitney said that she took care of Patsy at night and that Atlas, a home-health agency, took care of Patsy during the day. She stated that it was Brad's responsibility to take Patsy to her doctors' appointments but he did not care for Patsy after the stroke. She testified that as a result of the stroke, Patsy would hallucinate and see things, pretend she was sewing, get agitated, forget how to smoke her cigarettes, and get up at night. She also stated that Patsy thought she was still married to her first husband, whom she divorced in the 1990s. Whitney testified that most of Patsy's days were bad after the stroke and that Patsy sometimes did not remember her children's and grandchildren's names. She said Brad picked up Patsy's prescriptions, and she gave them to Patsy. She stated that she considered herself Patsy's primary caregiver during the time she lived with Patsy. She indicated that Patsy had fallen a couple of times, which led to her having to get a walker. She further stated that there "was a clear difference in [Patsy] mentally and emotionally after she had a stroke."
On cross-examination, Whitney stated that she lived in Patsy's house until after Patsy died. She said that she and Brad did not talk because they did not get along well. She admitted that she had no idea if Brad visited Patsy during the day because she worked, and would only know that information if Patsy told her. She said that she took care of Patsy's bills because Patsy could not "fill it out." She stated that her older sister would help Patsy with her bank statement so that she knew how much money she had. She said that Patsy informed her on May 25, 2015, that she was moving in with Brad; however, she stated that she believed that it was Brad's decision because Patsy indicated that she wanted to live in her house. She testified that Patsy did not sleep well and her days were bad after the stroke. Whitney stated *887 that she never visited Patsy after Patsy moved in with Brad because she "never got a call or felt welcome." However, she acknowledged seeing Patsy once when Brad brought her back to get some of her things out of the house. She said that no one knew anything about Patsy's health until she went to the nursing home.
Teresa Keeter testified that she witnessed Patsy's behaviors as described by Dr. Linker and Whitney. She stated that she had regular contact with Patsy before Patsy moved in with Brad. She admitted that she did not have much contact with Patsy prior to the stroke in 2014. She said that after Patsy's stroke, she, Brad, and Michael put together a care plan to ensure that Patsy had someone with her 24 hours a day. She testified that Whitney and Lacey lived with Patsy so they could be with her at night. She indicated that she went to Patsy's on the weekends. She stated that Kim was supposed to be with Patsy during the day, but she only did so for about two weeks, and then hired Atlas to stay with Patsy during the day, which was paid for out of Patsy's account. She said that Brad did not participate in Patsy's daily caregiving but that he would visit Patsy and take her to the doctor. Teresa stated that Patsy stayed at her home one weekend and was delusional. She indicated that the delusional behavior was common. She testified that she and Michael were involved in Patsy's care from the time she came home after the stroke in February 2014 until she moved in with Brad. She said that Brad never informed her that he was moving Patsy in with him and that she had to hear it from Michael. She also stated that Brad did not tell her when Patsy was admitted to the hospital because Brad said that Patsy did not want anyone to know because they had not called or visited since she moved in with Brad. However, she stated that Brad came by her house and told her the plan the day before Patsy was moved to Creekside. She said that she saw Patsy at Creekside for a couple of days before she died, but that Patsy could not communicate. She testified that she did not call Patsy while she was at Brad's because she knew that she would not hear from Patsy. Teresa said that she would have visited Patsy in the hospital had she known Patsy was there. She stated that Brad informed her that he had power of attorney over Patsy right before Patsy died. She said that Brad had taken Patsy to make funeral arrangements in 2014.
On cross-examination, Teresa stated that the last time she took Patsy to the doctor was in January 2015 for a neck surgery. She said that she did not know where Brad lived, because
after mom and dad divorced, it split the family and Brad didn't have anything to do with us. My mom got mad at me for not disowning my dad after their divorce [so] she had nothing to do with me or my kids or any of the rest of the family until she married Papa Dale. She had called and invited me to the wedding sometime around 2000. I don't recall how long I went without talking to my mom, probably at least ten years. She was married to Papa Dale until he died maybe seven or eight years. I really can't say if she and Michael had the same falling out after the divorce, I think they had more contact than I did. Brad was her go-to guy. They never had a falling out.
She admitted that she borrowed $1,700 from Patsy that she did not repay it before Patsy died. She said that she had Brad's phone number, but that she never called after Patsy moved in with him, even though she had saw Patsy nearly every week.
*888 On redirect, Teresa stated that Patsy lived about a month after she moved in with Brad. She said that she did not know why Brad changed Patsy's doctor. She stated that Patsy executed a will in 2010 after Papa Dale passed away. She said that Patsy had discussed the will with her and that it was Patsy's intention to divide everything in half and sell it. One-half would go to Papa Dale's children and half of it would go to Patsy's children. However, she testified that the new will left everything to Brad and everyone else was left out. She stated that she could not think of anything that would have made things bad again between her and Patsy.
On re-cross, she stated that although Papa Dale's kids did not help care for Patsy after he passed away, they would come to see Patsy. She said that Robin kept in touch with Patsy and that Brian came to see her some, too. She admitted that she and Patsy had an issue after the 2010 will because Patsy was mad at her and her daughter for talking about Brad and as a result, Patsy brought the divorce thing back up. She stated that they did not talk again until Patsy was hospitalized in 2014.
Robin Hunsperger testified that Patsy was her stepmother and that she loved Patsy. She stated that she lived about two hours away in Missouri, but she talked to Patsy about once a week. She said that Patsy used to live next door to her in Missouri and that she would see her daily. However, she said that they kept in contact with each other after Patsy moved back to Arkansas. She stated that she and Patsy would talk on the phone about the Bible. She testified that after Patsy's stroke in 2014, their conversations were still normal. She stated that it got to the point where Patsy would need help with her Bible verses and that she would have to finish Patsy's sentences. Robin testified that she observed Patsy's condition deteriorate after the stroke. She stated that she learned Patsy moved in with Brad after Patsy would not answer her phone. She said that Brad finally got in touch with her after they played "phone tag." She testified that she called Brad's house and spoke with Patsy, but the conversations were not good and Patsy was agitated and could not explain things. She said that about two weeks before Patsy died, it got to the point that she could no longer interpret Patsy's stories or make sense of them. She stated that during a conversation where Patsy was confused, Kim took the phone and said that she would give Robin her number. She said that she did not know "why they did that."
On cross-examination, Robin stated that she drove to see Patsy four or five times after Patsy needed 24-hour care. She stated that she visited with Patsy at Creekside and at Patsy's home before then. She said that she called Brad because she was unable to contact Patsy and she knew that Patsy did not like to call people. She stated that Patsy knew who she was when she called her.
Guila Cunningham testified that she had known Patsy for many years and that they were friends off and on throughout the years, but they became closer in 1994 when Patsy got divorced. She stated that they maintained that close relationship until Patsy died. She said that they became really close the last few years because they both were retired. Guila stated that she informed Patsy that she had her will drafted to leave everything to her middle son because he was the only one to do anything for her. She said that she and Patsy talked often and that Brad would bring Patsy to spend the night with her because her home was quieter. She testified that she knew Patsy had some problems, but she did not know what Patsy's diagnosis *889 was. She stated that they talked a lot about their past, present, and future after Patsy's stroke. She said that the only problem she noticed with Patsy was that Patsy could not use her hand well and had trouble holding her cigarette. She stated that she sometimes had to light Patsy's cigarettes for her. She testified that Patsy was depressed because of the living situation at her home. Guila testified that she never saw Patsy in a condition in which Patsy did not know what she was doing. She stated that Patsy knew who her children were.
Kelly Maddox testified that she worked as a legal assistant for attorney Andrew Bailey. She stated that she had prepared and witnessed wills as part of her job. She identified her signature on Patsy's 2015 will. She said that she was familiar with the capacity a person must have to execute a will and that she would not have signed as a witness if Patsy was not orientated to time and space.
On cross-examination, Kelly stated that Mr. Bailey did not prepare Patsy's will. She stated that she witnessed Patsy's will signing as a professional courtesy to Jeremy Friend. She said that she was only testifying to the contents of the affidavit or proof of will because she did not speak to Patsy before she witnessed the will.
Jeremy Friend testified that he was a solo-practitioner attorney, and had been so for six years. He stated that Patsy was his client. He said that he remembered meeting with Patsy as a client on three occasions: March 2015, May 2015, and June 2015. He stated that Patsy came to him in March to have a power of attorney, living will, and a healthcare proxy created. He said that the power of attorney and healthcare proxy were granted to Brad. According to Jeremy, Patsy's overall health seemed to be fine. He stated that she remembered him and his secretary. He testified that Guila was his grandmother and that he may have met Patsy one time at Guila's house. He stated that Patsy mentioned changing her will when she came to see him in March 2015, and he told her to bring him a copy of her will and he would look at it and see what changes she wanted to make. He said that Brad drove Patsy to the appointments; however, he never participated in the discussions of Patsy's testamentary wishes. He testified that in mid-or late May 2015, Patsy came back with her old will and told him what she wanted to do. He stated that she understood that she owned her home, and she knew who her children were, because she specifically wanted them out of the will. He said that Patsy did not seem to be under duress and there were no signs of coercion. He testified that he would not have prepared the will if he had suspected anything of that nature. Jeremy stated that he never had direct discussions with Brad, who may have been sitting there, but that Patsy told him herself what she wanted. He said that when Patsy came back June 3, 2015, to execute the will, Brad and Kim were with her. However, he stated that Patsy reiterated her intentions at that time. He said that Patsy seemed to have the same condition as previous visits, except her right hand appeared to have a tremor in it. He testified that Patsy was lucid and knew what she was doing. He continued,
I do the same thing in all my will signing ceremonies. I sit them down and go over the will provisions and make sure they know what they are doing. I never discussed the contents of the will with Brad. He may have called to set the appointment up for his mom. I know the requirement of sound mind for the execution of a will, and [Patsy] wanted to cut her other kids out because they didn't do anything for her and took advantage *890 of her. She showed no signs of hallucinating or being out of touch, she remembered me and my secretary. She knew what she was doing. She knew where she was and what day she was supposed to be here. I have no second doubts about her capacity that day.
On cross-examination, Jeremy stated that he was aware that Brad made the appointment and drove Patsy to it, but Brad did not sit in on the March meeting. He acknowledged that the power of attorney in March created a fiduciary relationship between Brad and Patsy. He stated that he did not remember directing anyone to go see Dr. Chitsey on the day the will was signed. He denied knowing Dr. Chitsey or why they would have gone to Dr. Chitsey in Harrison before coming to his office. He stated that there was no connection between that appointment and the appointment at his office.
Jeannie Booth testified that she worked at her son, Jeremy's, law office, typing wills and executing wills. She stated that she was familiar with Patsy, and that she was a witness on the day Patsy signed her will. She said that she and Patsy were joking and laughing and that Patsy was the same person she had known for years. She testified that Guila is her mother and that Guila and Patsy had been friends for years. She stated that there was no indication that Brad was influencing Patsy's decisions. She opined that Patsy knew what she was doing.
Brad testified that he lived in Peel, Arkansas, and had been there over twenty years. He stated that Patsy was his mother. He said that Patsy started talking about changing her will in 2013, but that he just put her off hoping that she would leave it alone. He stated that Patsy's desire to change her will got stronger after she got sick and went to see Jeremy in March. He said that he took her back so that she and Jeremy could talk about it. He stated that he did not want Patsy to change the will because he knew "this [was] where [they] would be." He testified that he told Patsy that a will change would cause a big fight, to which she replied it was her money to do with as she pleased. Brad testified in pertinent part:
When my mom and dad got divorced in the mid 90's, my mom and Teresa had a falling out because she turned her back on my mom and went with my dad who had had multiple affairs on her. Mom felt that was bad. Teresa and Mike had both sided with dad and I had sided with mom. Mom and Teresa had started to talk before mom's second marriage. They then had another falling out before mom went to the hospital for her stroke in February 2014. Mom's health did take a turn for the worse when she had her first stroke.
To hear the rest of them tell it, mom ... was so bad off she couldn't do anything for herself and that's not true. She would have hallucinations when she was not sleeping right. When they would give her medicine to help with the sleep, her hallucination would get better. We made the decision to keep mom at our house after we were keeping her for weekends in April and May of 2015. She started not wanting to go home and wanted to stay with us. She had wanted us to move to her house but I told her, no but she could stay with us. Whitney and her son were living in mom's house at that time. Whitney's boyfriend was living there too. They weren't paying any rent. They testified I didn't help at all and only for a couple weeks, but that was the plan when we left the hospital. My wife would take a couple weeks off work and look after mom until Atlas could get set up. Atlas is a home healthcare business. Atlas lasted for quite a *891 while. They did the cleaning, fixed her meals and bathed her if needed. They came every day. Whitney did not do as much as she testified, because Atlas was already doing it ... There was never a conversation between me and my siblings about moving mom. Mom said she wanted to move and [I] told her she better tell them. She said she didn't have to tell anyone what she was doing. My life was not made easier by moving mom in with me. When we moved her in, we were entirely responsible for her care. I never hid mom from anyone. My phone number is in the phone book if anyone doesn't have it. Both my siblings both have my cell phone number. They never called asking about mom. Robin did call my mom. I'm not surprised that Teresa and Mike wouldn't try to check on mom if they had to talk to me. I knew they would be mad and mom said, "Son, they can't hate you more than they already do." We tried to avoid each other, because I knew how the[y] felt about me. I did go over there quite a bit, but the arrangement was that they would be there to help because Whitney lived there. I switched her from Dr. Dunaway, because she was taking so much medicine and things weren't improving, so she wanted to try a different doctor. We wanted a second opinion because she was still having trouble sleeping. Chitsey was my doctor and I like him so we tried him. We had an appointment to see Chitsey on the 13th of June and we had gotten mom ready and when we went to get her from the living room, she was just out of it. She looked like she had a stroke. We called an ambulance. They had to carry her out. [The] paramedics said she became conscious when they got to Harrison. Something happened to mom that morning. It was so bad we called the ambulance. When we got to Harrison, she could talk but it didn't make sense. Her face was droopy. After she was admitted in the hospital, she said not to call Teresa and Mike because they hadn't bothered to check on her in the last six weeks. Mom never got over them siding with dad in the divorce. She talked about it all the time.... I never asked my mom to change the will. In fact, I asked her not to. Mom was discharged from the hospital to Creekside nursing home. I told Mike and Teresa she was going there.
The deposition testimony of Dr. Dunaway was admitted into evidence. Dr. Dunaway testified that he had been in family practice for thirty-four years. He stated that Patsy was a patient of his for several years before she was admitted into the hospital on February 22, 2014. He said that upon her discharge, he diagnosed her with mild vascular dementia, which is caused by a stroke or other vascular change. He testified that vascular dementia could be static until something happened or it could move rapidly. He opined that Patsy's hallucinations could be from delirium from being in a strange setting and that she may have had sundowners, where the hallucinations were brought on at nighttime. He said that it was associated with dementia. Dr. Dunaway stated that Patsy took a SLUMS test on February 24, 2014, and scored an 8 out of 30, which showed mild cognitive impairment. He said that a CT scan performed on her revealed plaque buildup, but there was no acute finding of a stroke. However, he stated that she was experiencing blood shrinkage in the head and hardening of the arteries, which are consistent with the onset of dementia. He testified that his note from October 22, 2014, indicated that Patsy was having impaired mental status and that she was developing a urinary-tract infection, which would exacerbate a cognitive impairment. He testified that his notes *892 from November 2, 2014, showed that Patsy had been falling, seeing things, and talking to people who were not there, which were signs of dementia. Dr. Dunaway stated that he ordered an MRI on December 22, 2014, based on his diagnosis of dementia and that the report revealed that everything was stable since the CT scan performed in February, which he stated showed atrophy of the brain. He said that his next visit with Patsy was on January 29, 2015, and at that time she was developing a stenosis in the neck which could affect dementia, as it affected blood flow to the brain. He testified that he referred her to a doctor in Fayetteville for treatment. According to Dr. Dunaway, he made a referral on April 3, 2015, for Patsy to go to occupational therapy (OT) to get some help with self-care. He stated that the last time he saw Patsy in his office was on April 9, 2015. He testified that he did not know why they changed physicians. He further testified that
[a] change in environment can affect behavior and level of function, not sure that it would affect the course of the disease. Dementia is a bundle of symptoms. It would be difficult to ascertain she could be competent in June of 2015. Perhaps if she was having a good day and it was the middle of the day. I would have concerns on her competence and her ability to recall her estate. Some days she may know, some days, she may not. Dementia can make you rely on your caregivers more. I am familiar with Reliant Behavioral Health unit. They are a geriatric psych unit. Based on her records from June 15th or 16th her condition had worsened significantly since I last saw her as a patient. It would be pretty shaky to see her being competent a couple weeks before that.
On cross-examination, Dr. Dunaway testified that he believed he saw Patsy as a patient for roughly three years. He opined that Patsy's aggressive cigarette smoking played a role in her dementia. He stated that Patsy's orientation decreased over time. He said that the referral for OT was at the request of Patsy's family to see if she could improve her daily activities. He testified that Patsy was not a danger to others, but her falling could be a problem. He stated that she was able to communicate with him as a patient, but they never got very deep and he had to pry things from her; however, he attributed that to her being very private. He agreed that a person with dementia could have good days and bad days. He stated that the MRI was done to detect a stroke, but he was not able to prove she had a stroke even though she acted like she could have had one. He denied ever seeing Patsy hallucinate in his office. Dr. Dunaway stated that Patsy's last neurological exam was performed on February 27, 2015, and she was neurologically the same following her neck surgery. He said that he performed a on biopsy on Patsy on March 20, 2015, and that he also changed her medication to Seroquel to stop hallucinations. He testified that Patsy's baseline was about the same throughout his treatment of her, but he said that he gave her medicine during this time to help her sleep. He admitted that there was no record of psychosis on June 3, 2015, from North Arkansas Regional Medical Center. He stated that he could not say whether Patsy was competent on June 3.
On redirect, Dr. Dunaway stated that based on the records from June 17, 2015, Patsy no longer had executive function. He opined that her executive function was impaired from the first diagnosis of vascular dementia, despite her having good and bad days. He testified that without seeing Patsy on June 3, he would not be able to say how she was.
*893 The trial court entered an order on July 19, 2017, finding the 2015 will invalid and void. The order stated in pertinent part:
The contestants also allege that [Patsy] was under undue influence when she executed the June 3, 2015 will. In March of 2015, [Patsy] signed a power of attorney, that was still in effect on June 3, 2015, appointing Brad Wiseman as her agent and attorney in fact. The power of attorney created a confidential relationship between Brad Wiseman and [Patsy], and triggered a presumption of undue influence that shifted the burden of proof to Brad Wiseman to prove by a clear preponderance of evidence that there was no undue influence. Cf. Birch v. Coleman , 15 Ark. App. 215, 691 S.W.2d 875 (1985) (confidential or fiduciary relationship was a guardianship rather than an attorney in fact).
[Patsy's] estate presented testimony from the attorney who prepared the June 3, 2015 will and others present when the will was signed that they saw no undue influence. In addition, Brad Wiseman denied that he had exerted undue influence on this mother to get her to change her will. Against this, there was evidence that [Patsy] was susceptible to undue influence including, but not limited to: medical records and testimony showing that [Patsy] was in poor mental health; that she had required full time care for a time in excess of a year prior to the sign[ing] of the June 3, 2015 will; that the June 3, 2015 will excluded children and stepchildren (with some of whom she had a close relationship); that the person with whom she had a confidential relationship was made her primary beneficiary; and that she had recently moved from her home into the home of the primary beneficiary.
The "clear preponderance" standard of proof requires a greater degree of proof than a simple preponderance, but less than proof beyond a reasonable doubt. See 32A C.J.S. Evidence § 1628. The court has considered all the evidence of record, whether or not discussed herein. After doing so, the court finds that the proponent of the June 3, 2015 will has failed to present sufficient evidence to rebut the presumed fact that [Patsy] was under undue influence at the time she signed the will in question. Therefore, the petition contesting the June 3, 2015 will should be, and hereby is, granted and the will is declared invalid and void.
Brad filed a timely notice of appeal on August 18, 2017.
On appeal, Brad argues that the trial court erred by: (1) shifting the burden of proof and employing the wrong standard and (2) finding that he did not meet the burden. Since these arguments are related, we will address them together. We review probate cases de novo, but we will not reverse the decision of the trial court unless it is clearly erroneous.[5] We give due deference to the superior position of the trial court to determine the credibility of witnesses and the weight to be accorded their testimony.[6]
In a typical will contest, the burden of proving the invalidity of a will due to lack of testamentary capacity, undue influence, or fraud is on the contestant.[7] If the proponent of a will, however, procures the making of the will, then a presumption *894 of undue influence arises, and the burden of proof shifts to the proponent to prove beyond a reasonable doubt that the testator had testamentary capacity and was free from undue influence in executing the will.[8] If there exists a confidential relationship between the testator and the primary beneficiary, then a rebuttable presumption of undue influence arises.[9]
To the extent that Brad argues that the court was wrong in shifting the burden to him, he is incorrect. The evidence showed that Brad, as Patsy's power of attorney, was in a confidential relationship with Patsy. He was also the primary beneficiary. Therefore, the court was correct in requiring Brad to rebut the presumption that he exerted undue influence over Patsy. The trial court stated in the order that Brad was unable to meet his burden of proof, which the court incorrectly explained was "a clear preponderance." According to the court, this standard required a greater degree of proof than "a simple preponderance," but less proof than beyond a reasonable doubt. However, there is no Arkansas case law making such a distinction. Thus, we consider "a clear preponderance" to mean nothing more than a preponderance. With that said, we now turn to whether Brad was able to rebut the presumption of undue influence, even under the lesser preponderance standard. We hold that he did not.
Undue influence on a testator may be inferred from the facts and circumstances.[10] Patsy was diagnosed with dementia in 2014 after she suffered what appeared to be a stroke. After that time, her mental health declined, and she would hallucinate, among other things. Due to the decline in her mental state, the family decided that she needed 24-hour care. The evidence showed that Patsy's dementia could lead to a greater reliance on her caregiver(s). In March 2015, Brad took Patsy to Jeremy so that she could give Brad power of attorney over her. In May, Brad set up an appointment and returned with Patsy to Jeremy's office so that she could dictate what changes she wanted made to her will. It is unclear if he moved her in with him before or after this May visit. However, around May 25, 2015, Brad moved Patsy in with him without consulting with his siblings or nieces before doing so. Family members did not speak to Patsy after she moved in with Brad, and he and his wife were responsible for her care. At some point, Brad changed Patsy from her regular physician, Dr. Dunaway, to his physician, Dr. Chitsey. On June 3, 2015, Brad took Patsy to see Dr. Chitsey, and to Jeremy's office to execute her new will leaving the bulk of her estate to Brad. Brad's wife, Kim, was also present on this date. Robin, Patsy's stepdaughter, was able to speak to Patsy in the weeks prior to her death. During one phone call, when she was unable to make sense of what Patsy was trying to tell her, Kim took the phone and stated that she would give Robin her number. On June 13, 2015, Patsy's condition worsened to the point that she had to be taken to the hospital by ambulance. Brad did not notify anyone that Patsy was hospitalized. It was only when Patsy was being moved to Creekside that he notified them and let them know what was going on with her. In arguing that he rebutted the presumption of undue influence, Brad relies on the fact that he and Patsy had a close relationship, none of the *895 witnesses present testified that there was undue influence, and Patsy discussed changing her will with Jeremy in March, several months before she moved in with Brad. However, cases involving undue influence will frequently depend on the credibility of witnesses, and we give due deference to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony.[11] Here, the trial court was presented with competing evidence and had to decide which side was more credible. Based on the evidence and testimony presented at the hearing, which has been extensively discussed above, we cannot say that the trial court was clearly erroneous when it found that Brad failed to rebut the presumption of undue influence. Accordingly, we affirm.
Affirmed.
Glover and Vaught, JJ., agree.

We note that the statement of the case in Brad's brief is deficient; however, it is not so bad as to frustrate our efforts to examine the points on appeal and address the merits. Therefore, we are not ordering rebriefing, but we encourage counsel to refer to Arkansas Supreme Court Rule 4-2 to ensure that all our briefing rules are followed.

It is also spelled Bryon in places.

The real property was valued at $150,000 and the personal property was valued at $2,000. However, Brad filed a petition for authority to sell the real property for $140,000 on January 6, 2016. The court filed an order authorizing the sale the same day.

She was discharged to Creekside Nursing Home.

Medlock v. Mitchell , 95 Ark. App. 132, 234 S.W.3d 901 (2006).

Id.

Parker v. Parker , 237 Ark. 942, 377 S.W.2d 160 (1964) ; Sullivant v. Sullivant , 236 Ark. 95, 364 S.W.2d 665 (1963).

Hiler v. Cude , 248 Ark. 1065, 455 S.W.2d 891 (1970) ; In re Estate of Garrett , 81 Ark. App. 212, 100 S.W.3d 72 (2003).

Simpson v. Simpson , 2014 Ark. App. 80, 432 S.W.3d 66 ; Medlock , supra.

Medlock , supra.

Id.