Cite as 2020 Ark. App. 113

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-18-855

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF EUNICE GOYE SMITH, DECEASED | **Opinion Delivered:** February 19, 2020 |
| MARTIN SMITH | APPEAL FROM THE LITTLE RIVER COUNTY CIRCUIT COURT [NO. 41PR–17–1] |
| APPELLANT | |
| V. | HONORABLE CHARLES A. YEARGAN, JUDGE |
| DERRELL SMITH AND LLOYD SMITH, JR. | AFFIRMED IN PART; REVERSED IN PART |
| APPELLEES | |

## RITA W. GRUBER, Chief Judge

The appellant, Martin Smith, and the appellees, Lloyd and Derrell Smith, are brothers. Their mother, Eunice Smith, died on December 17, 2016.

This appeal involves real property that Eunice bequeathed to Martin in a will that she executed on May 27, 2010, as well as conveyances of the property that took place in 2012 and 2014. Lloyd and Derrell challenged the will and conveyances alleging that their mother lacked the mental capacity and free will to execute them. The circuit court agreed and entered an order setting aside the will, which had been admitted into probate, and imposing a constructive trust on the property. Martin now appeals the circuit court's order.

We affirm the circuit court's order setting aside the will, but we reverse the imposition of the constructive trust.

## I. *Facts and Procedural History*

In 2006, Eunice and her husband, Lloyd Sr., executed a will that bequeathed their home and land to their three sons "equally as tenants in common in equal undivided 1/3rd interest in each to said home and [land] in Foreman, Arkansas[.]" Lloyd Sr. and Eunice also executed a power of attorney that appointed Lloyd Jr., their eldest son, as their attorney-in-fact.

Lloyd Sr. died on June 29, 2009. Two months later, Eunice used her money to open a joint bank account with Martin (and later, Martin's wife Sonja). She also executed a new power of attorney in which she appointed Martin to replace Lloyd Jr. as her attorney-in-fact. The next year, on May 27, 2010, Eunice executed a will that appointed Martin as her executor and bequeathed her home "and the lots upon which said home is located, and adjoining acreage" solely to him on the condition that "he pay within six months of [Eunice's] death the sum of $10,000.00" to Lloyd Jr. and Derrell.

Medical records that were admitted into evidence indicate that Eunice, who was eighty-three years old when her husband died in 2009, began to show signs of dementia late in 2010. Eunice apparently was prone to having transient ischemic attacks, or "mini-strokes," and her physician, Dr. Paul Gardial, noted for the first time on March 30, 2011, that Eunice "present[ed] with altered mental status" at an office visit. Dr. Gardial further noted that Eunice "[had] not been previously diagnosed with any form of dementia," but she and her family reported that her altered mental status "[had] been present for [six]

2

months." Dr. Gardial opined that Eunice's mental status "appear[ed] to be gradually deteriorating," but she was still capable of managing her own self-care and could "converse in a meaningful manner; recognize familiar faces; find her way home; remember her name; remember where she lives; [and] remember the date[.]"

A few weeks later, on April 19, 2011, Eunice was admitted to the hospital with numbness in her right hand. The record of her admission notes "possible dementia" and reported that "[h]er son states that she gets confused . . . and has visual hallucinations at times." A scan of Eunice's brain showed "atrophy and some old strokes but nothing acute," and she was diagnosed as having had another ministroke. Shortly after Eunice was released from the hospital, Dr. Gardial certified that she needed part-time home health care because she had dementia and other health problems.

Eunice's next significant health event occurred in December 2011 when she suffered a severe stroke. She thereafter required more extensive home care. Starting in January 2012, Eunice began living with Martin, and Sonja became her primary caretaker. Two months later, on March 20, Eunice executed a special warranty deed that transferred her home and property to Martin and Sonja as tenants by the entirety.

Eunice continued to live with Martin and Sonja until February 2014 when a severe fall at home made it necessary to transfer her care to a nursing home. At that time, and in order to avoid a sizeable Medicaid penalty for the gift transfer that Eunice made in 2012, Martin and Sonja executed a warranty deed that transferred 99 percent of their interest in the house and property back to Eunice and retained the remaining one percent interest for themselves. A "survivorship agreement," which was attached to the 2014 warranty deed,

3

provided that Eunice, Martin, and Sonja thereafter owned the property "in the same manner as joint tenants with right of survivorship." Consequently, "[i]f no severance occur[red] before the death of any owner, then on the death of either owner, the interest of the joint owner who dies shall survive to the surviving joint owner." Martin, as Eunice's attorney-in-fact, signed the survivorship agreement on her behalf.

Eunice died on December 17, 2016, whereupon the circuit court entered an order on January 31, 2017, probating her last will executed on May 27, 2010, and appointing Martin as the executor of the estate. On February 2, 2017, Lloyd Jr., Derrell, and Derrell's three children (who were expressly disinherited in the last will) filed a petition to contest the will and a motion to set aside the circuit court's probate order, alleging that Eunice "was unduly influenced by Martin Smith and lacked testamentary capacity to execute the will in question." In addition, on July 10, 2017, Derrell filed a petition requesting the imposition of a constructive trust. Derrell argued that the probated will was the product of Martin's undue influence, which was "aided by [Eunice's] declining health and mental incompetency." He also argued that the 2012 and 2014 conveyances of the house and property were the products of undue influence and urged the circuit court to void those transactions and impose a constructive trust on the property.[1]

---

[1]The Arkansas Department of Human Services (DHS) entered an appearance and filed a pleading in which it asserted that Eunice's 99 percent interest in her home and property belonged to her estate, and not to Martin and Sonja by virtue of the survivorship agreement. While the circuit court announced at the start of the hearing that it "will enter an oral order allowing DHS to intervene," that order actually would not become effective until it was reduced to writing. *See Nat'l Home Ctrs., Inc. v. Coleman*, 370 Ark. 119, 120, 257 S.W.3d 862, 863 (2001). We have not found a written order in the record, and DHS has not filed a brief in this appeal.

4

At the April 23, 2018 hearing, Martin testified that he had lived on the land beside his parents for thirty-one years, and he described Eunice as a "strong willed" person who freely "voiced her opinion." After Lloyd Sr. died in 2009, Eunice decided to change the power of attorney because she was not satisfied with "the way that Lloyd Jr. had [taken] care of his own business through the years," which according to Martin, included "not taking care of things; not paying things." Martin testified that he "did not ask to be [Eunice's] power of attorney," but rather, "she chose me." He also asserted that neither he nor his wife asked to be put on Eunice's bank account.

Martin further testified that Eunice wanted to create a new will in May 2010 because she "felt like nobody else wanted to take care of her [or] help her" and because she had caught Derrell and one of his children going through her purse while they were in town for Lloyd Sr.'s funeral. Martin also explained that he and his wife likely drove Eunice to meet with her lawyer, but he claimed that she did not tell him beforehand that she intended to leave her home and property to him. He also denied participating in his mother's meeting with her lawyer, and he indicated that he saw the will for the first time "not long after she had it done." In addition, Martin acknowledged that in contrast to the will that his mother executed in 2006, the May 2010 will devised his mother's home and property to him on the condition that he pay each of his brothers $10,000.

Martin also explained that he did not ask Eunice to execute the March 20, 2012 deed that transferred her property to him and Sonja. He claimed, rather, that "she deeded the property to [him] on her own" because "nobody else would take care of her." In particular, Martin indicated that Eunice felt that she had been poorly treated by his brothers, and he

5

referred to incidents in 2010 in which Derrell got angry with Eunice for refusing to give him a key to her house or her motor home (which he intended to sell). Martin also claimed that Lloyd Jr. refused to take care of his mother and that he had caught Lloyd Jr. and Derrell going through their parents' safe shortly after Lloyd Sr. died in 2009.

Additionally, Martin testified that the 2014 deed and survivorship agreement were executed on the advice of Lisa Shoalmire, an elder-law attorney that the family retained in 2013. He explained that the purpose of the transaction was—as indicated above—to allow Medicaid to pay for Eunice's care in a nursing home and to enable the return of Eunice's 99 percent interest to Martin and Sonja at her death.

Judge John Finley, a part-time district judge, testified that he prepared three wills for Eunice after the death of her husband. She executed the first in August 2009, the second in March 2010, and the third, which was admitted into probate, on May 27, 2010. Judge Finley testified that the three versions of the will were similar, and the 2009 will, consistent with the last will that Eunice executed in May 2010, left the home to Martin with "payment to the other two."

Judge Finley described Eunice as "a very strong willed and nice lady" who was "definitely opinionated" and "definitely knew what she was doing" in his meetings with her. He testified, in fact, that he knew Eunice for many years and would recognize any change in her mental state. Judge Finley also explained that while Eunice appeared to have a good relationship with Marty and Sonja, he "did always ask her outside of their presence if this was the will that she wished to execute." Judge Finley also observed that while Martin had power of attorney, he

6

had nothing to do with the way [Eunice] ever did her wills. She did her wills the way she intended them to be. She made the statement to me at times that she might be stubborn and she intended to do things the way she wanted to do them. So the consistency that I see throughout is the fact that she wanted Marty to have a home, first just possession, then to have it to be able to pay the brothers, and then, ultimately, finally, apparently, the deed where it was given to him.

In particular, Judge Finley denied that there was any indication that Eunice was impaired or incapable of executing her last will on May 27, 2010. He also denied that there was any reason to believe that she was acting under any undue influence.

Judge Finley also testified that Eunice asked him to prepare the warranty deed that she executed on March 20, 2012, and he did not "recall [Martin and Sonja] ever asking [him] to do anything like [that]." As a standard practice, Judge Finley prepared an "affidavit and statement of grantor" to accompany the deed, wherein Eunice acknowledged, among other things, that she was "of sound mind and good health." Judge Finley claimed that he would not have verified the affidavit if he believed that Eunice lacked the mental capacity to execute the deed.

Lisa Shoalmire testified that she first met with Martin and Sonja in September 2013. She explained that the couple presented "as full-time caregivers" who, at that time, anticipated "there would likely be a need for more intense care of [Eunice]." The first order of business was to prepare a "caregiver contract" that, for Medicaid purposes, would formalize the caregiving arrangement that already existed between Eunice and Sonja.[2] Ms. Shoalmire testified that she did not see "any indication of any family conflict with Ms.

---

[2]Sonja, who had become Eunice's primary caregiver after her stroke, was paid $500 a week from the joint bank account that Eunice, Martin, and Sonja shared.

Eunice's family," and she observed that there "was clearly an affection between Ms. Smith and Sonja," when she met with them about the caregiver contract in October 2013.

Ms. Shoalmire also reviewed Eunice's assets to evaluate her eligibility for Medicaid. To that end, she identified the March 20, 2012 deed, in which Eunice gifted her home and property to Martin and Sonja, as a potential problem because Medicaid rules impose a substantial penalty on uncompensated transfers that occur within five years of the date of an application for Medicaid services. As a remedy, Ms. Shoalmire prepared a deed and an incorporated survivorship agreement in which Martin and Sonja—as described above—transferred 99 percent of their interest back to Eunice and owned the remaining 1 percent as joint tenants with right of survivorship. Ms. Shoalmire explained that Martin and Sonja did not receive any monetary benefit from the 2014 deed because "the benefit had been bestowed on them back in 2012 with the original gift so there was no change in the position of any of the parties."

Derrell, who lives in California, testified that he came back home to visit Eunice in 2010 and 2014. He agreed that his mother was a strong-willed woman, but he testified that he started to have concerns about her behavior during a visit in March 2010. Specifically, Martin told him that Eunice "had actually fired [a] gun inside the house because she thought there were intruders," and "Marty himself would not go up to the house until he was called." Derrell further testified that he had seen medical records indicating that Eunice had been diagnosed with dementia and Alzheimer's, and he noticed her mental decline during his visits home. He claimed, in fact, that he and his family would have to "kind of reintroduce [themselves]" to Eunice because she occasionally failed to recognize them.

8

Derrell also testified that he telephoned Eunice regularly until she moved in with Martin and Sonja after her stroke in 2011. He alleged that it "was just an uncomfortable situation," from that point forward, and Martin made it difficult for him to talk to his mother. Derrell also claimed that Martin did not keep him informed about his mother's health and that he was otherwise "left out of the loop" regarding the change in the power of attorney, the execution of Eunice's last will on May 27, 2010, and the deed transfers that occurred in 2012 and 2014. Derrell did acknowledge, however, that he learned about the 2012 and 2014 conveyances when he and Lloyd Jr. petitioned for guardianship of their mother approximately two years before her death.

Lloyd Jr. testified that his mother lived alone in her home for two years before she began living with Martin and Sonja. He stated that Eunice appeared paranoid during his visits with her. According to Lloyd Jr., Eunice was propping chairs up against doors to guard against intruders; she had begun carrying a pistol; she had installed extra locks on her home; and she believed Sonja was stealing clothes from her house. Lloyd Jr. testified that he believed his mother's behavior began to change soon after his father died in 2009, but he later acknowledged that "it could [have been] 2010 . . . or early 2011."

Lloyd Jr. otherwise described his mother as "strong-willed" and "authoritarian," and he stated that she paid the bills and "handled the books" for the family. He also claimed that Eunice's judgment "was not as sound" as his father's, and he described one instance in which he had to convince her not to "go see the attorney and take [Martin] off her will."

Lloyd Jr. also indicated that Martin had not informed him that Eunice had changed her will, but he acknowledged that Martin told him about the March 20, 2012 deed later

9

that year. Additionally, like his brother Derrell, Lloyd Jr. claimed that Martin did not regularly consult him or make him aware of issues concerning Eunice's health.

After hearing this testimony, the circuit court entered findings of fact and conclusions of law that invalidated Eunice's last will and imposed a constructive trust on her home and property. The court found that "Derrell and Lloyd Smith's testimony was credible, while Martin Smith and the attorneys' testimony was less credible." The circuit court also concluded that the evidence established that Eunice and Lloyd Sr. both intended "that the three sons would inherit the family land, home, and equipment equally as the original will stated," and the deeds that were executed in 2012 and 2014 did not manifest a contrary intent because "the transfers were made [only] for Medicare and/or estate planning purposes." The court also rejected Martin's argument that the statute of limitations barred any challenge to the deeds, concluding that the three-year limitations clock did not begin to run until after Eunice died in 2016. In particular, the circuit court found that

> [t]he evidence showed that Martin Smith secured interest in the property by either intentionally promising falsely to convey at a later date, or by violating a confidential duty owed to Eunice Smith. Martin Smith's broken promise is supported by the testimony that all of the children were in good standing with Eunice Smith.
>
> . . . .
>
> The statute of limitations does not run in favor of the trustee of a resulting trust until the trustee disavows the trust or asserts some right to the property inconsistent with it, i.e., after the death of Eunice Smith and after Martin Smith's failure to transfer the property to the siblings in equal shares.

The circuit court went on to conclude that Martin and Eunice were in a confidential relationship, raising a rebuttable presumption that Eunice's last will, the March 20, 2012 deed, and the 2014 survivorship agreement were the products of Martin's undue influence.

10

Noting Eunice's diagnoses of dementia and declining mental capacity, the circuit court concluded that Martin failed to rebut that presumption. The court ordered, therefore, that "the property of the estate shall pass intestate," and it imposed a constructive trust on the real property.

## II. *Issues on Appeal*

Martin asserts that the circuit court erred in four respects. First, he contends that the circuit court erred by rejecting his statute-of-limitations defense to the real property transfers that occurred in 2012 and 2014. He also takes issue with two of the circuit court's evidentiary rulings, arguing that the circuit court erred by allowing testimony about the contents of the will that Lloyd Sr. and Eunice executed in 2006, as well as testimony about expenditures of money from Eunice's account prior to her death. Finally, Martin argues that the circuit court clearly erred by ruling that he failed to rebut the presumption of undue influence attending to Eunice's execution of her last will.

## III. *Standard of Review*

This court reviews equity proceedings de novo, but it will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Griffith v. Griffith*, 2018 Ark. App. 122, at 7, 545 S.W.2d 212, 216. A finding is clearly erroneous when, although there is evidence to support it, this court is left on the entire evidence with the firm conviction that a mistake was made. *Id.* The court generally defers, however, to the superior position of the circuit court to weigh the credibility of the witnesses. *Id.*

IV. *Discussion*

A. Statute of Limitations

Martin first argues that the three-year statute of limitations in Arkansas Code Annotated section 4-59-209 applies "to causes of action to set aside deeds for <u>any</u> reason"; therefore, it should be applied to bar Derrell's challenge to the 2012 deed as well as to any challenge to the 2014 deed and survivorship agreement.[3] In the alternative, he argues that the petition for constructive trust is based on claims that he breached his fiduciary duty; therefore, the three-year statute of limitation for tort claims in Arkansas Code Annotated section 16-56-105 (Repl. 2005) also applies. Martin further asserts that, whichever three-year clock applies, the time to challenge the deed and survivorship agreement began to run no later than the execution of those documents on March 20, 2012, and April 24, 2014, respectively.

In response, Derrell argues that the three-year clock did not begin to run until Martin "disavow[ed] or assert[ed] some right to the property that's inconsistent with the trust." He appears to presume that Eunice and Martin agreed that Martin would hold the land in trust for his brothers when Eunice transferred the property to him in 2012. Derrell claims, therefore, that Martin disavowed that trust when he failed to convey his brothers' interest to them after Eunice died in 2016. Because we agree with Martin that the petition for imposition of a constructive trust is based on breach-of-fiduciary claims governed by section

---

[3]Section 4-59-209 was amended by Act 1086 of 2017. It now prescribes a four-year statute of limitations.

16-56-105, and the petition for constructive trust was filed more than three years after those claims accrued, we reverse the order imposing the constructive trust. [4]

As an initial matter, section 16-56-105—not section 4-59-209—applies to the claims that Martin breached his fiduciary duty. "When making a determination about what statute of limitations applies in a case, the court must look to the facts alleged in the complaint itself to ascertain the area of law in which they sound." *Kassess v. Satterfield*, 2009 Ark. 91, at 4, 303 S.W.3d 42, 44–45. Stated another way, the "gist" of the cause of action is determinative. *See id.*

Section 4-59-209 prescribes a three-year statute of limitations for claims under the Arkansas Fraudulent Transfers Act, which, among other things, provides remedies to creditors seeking to set aside fraudulent conveyances by their debtors. In this case, Derrell is not a creditor seeking a remedy under that Act. Rather, the facts alleged in the petition sound in tort, asserting that a constructive trust should be imposed because "Martin Smith breached his fiduciary duty as an agent holding power of attorney and used undue influence over a person he had an intimate relationship with . . . as [a] caretaker and agent." The three-year statute of limitations for torts in section 16-56-105 more aptly applies, therefore, to the claims alleged in the petition. *See Hill v. Hartness*, 2017 Ark. App. 664, at 5, 536 S.W.3d 649, 652.

---

[4]Martin alternatively argues that the order imposing the constructive trust should be reversed because it is based on erroneous findings of fact and conclusions of law. Because we agree that the claims in the petition for constructive trust are time-barred, we decline to reach Martin's alternative argument.

Additionally, in the absence of concealment, a claim alleging a breach of fiduciary duty accrues when the alleged breach occurs. *See Stolz v. Friday*, 325 Ark. 399, 405, 926 S.W.2d 438, 442 (1996). Here, the alleged breaches occurred on March 20, 2012, and April 24, 2014, when the deed and survivorship agreement, respectively, were executed. Accordingly, the claims in the petition for constructive trust, which were filed more than three years later on July 10, 2017, are time-barred under section 16-56-105.

Derrell's argument on appeal, which relies on inapposite law pertaining to resulting trusts, does not compel a conclusion that the claims accrued at a later date. A resulting trust is an implied trust that "arises in favor of the person who transferred . . . property or caused it to be transferred under circumstances raising an inference that [she] intended to transfer to the other a bare legal title and not give him the beneficial interest." *Edwards v. Edwards*, 311 Ark. 339, 344, 843 S.W.2d 846, 849 (1992). There was simply no evidence that Eunice intended, at the time of the transactions, that Martin would hold her property in trust for her or her estate.

A constructive trust, on the other hand, is an implied trust that a court imposes in order to prevent unjust enrichment. *Betts v. Betts*, 326 Ark. 544, 547, 932 S.W.2d 336, 337 (1996). A constructive trust is "more aptly characterized as a 'fraud-rectifying trust,'" 76 Am Jur. 2d. *Trusts* § 132 (2005), and it typically arises "in favor of persons entitled to a beneficial interest against one who secured legal title either by an intentional false oral promise to hold the title for a specified purpose, or by violation of a confidential or fiduciary duty, or is guilty of any other unconscionable conduct which amounts to a constructive fraud." *Betts*, 326 Ark. at 547, 932 S.W.2d at 337.

14

There was no evidence that Martin made any false promise regarding the property that would warrant the imposition of a constructive trust. Rather, Derrell alleged that the conveyances should be set aside because Martin unduly influenced Eunice and thereby breached the fiduciary duty that he owed to her as her attorney-in-fact. The limitations clock started running, therefore, when the alleged undue influence occurred and not, as Derrell would have it, at the repudiation or disavowal of any false promise or trust. Accordingly, because the three-year statute of limitations in section 16-56-105 expired before Derrell filed his petition on July 10, 2017, we reverse and remand the order imposing the constructive trust.

## B. Evidentiary Issues

### 1. *Testimony about the 2006 wills*

Martin next argues that the trial court erred when it allowed testimony about the terms of the wills that his parents executed in 2006. According to Martin, the testimony was improper because it was irrelevant and was "blatant hearsay." Because Martin waived these arguments by failing to make timely and appropriate objections below, we affirm.

Martin was the first witness to testify about the contents of the will that his parents executed in 2006. On direct examination by Derrell's counsel, Martin's testimony and objection were as follows:

Q. Has your attorney shown you the will from 2006?

A. No, I don't believe she has it.

Q. Has anybody discussed with you the contents of that will?

A. My mother may have or my father may have, both of them.

Q. What did they tell you about the will?

MARTIN'S COUNSEL: Your Honor, I'm going to object to that as hearsay.

THE COURT: Sustained.

During the same direct examination by Derrell's counsel, the following colloquy and objection occurred:

Q. If I showed you a copy of the 2006 will would that refresh your recollection?

A. Probably would.

MARTIN'S COUNSEL: Your Honor, I would object unless we have an original of [the 2006] will.

. . . .

DERRELL'S COUNSEL: I'm not going to admit it. I believe it has already been in another proceeding. Just to refresh his recollection . . . .

THE COURT: Overrule the objection.

Finally, when Derrell's counsel asked Martin to read from the will, Martin's counsel lodged the following objection:

Q. . . . and if you could just read the first there?

A. "I hereby give."

. . . .

MARTIN'S COUNSEL: Your Honor, I don't believe this is refreshing his recollection, if he's just being asked to read from the document.

THE COURT: I believe that's what you gave it to him for.

Martin thereafter read from the will without any additional objections from his counsel.

Derrell and Lloyd Jr. also testified about the contents of the 2006 will. Derrell described the contents of the will without objection, and he drew a hearsay objection only

when he purported to repeat his mother's half of a conversation. The last objection to testimony about the 2006 will occurred when Martin made a relevancy objection to Lloyd's references to his parents' "wishes," as reflected in the document.

A party must object at the first opportunity to preserve an issue for appeal. *E.g.*, *Chunestudy v. State*, 2012 Ark. 222, at 9, 408 S.W.3d 55, 61. Additionally, "[w]hen a [party] successfully objects to a question on the basis of hearsay and the same or similar question is later asked, the [party] must renew his objection or else the initial objection is waived." *Mills v. State*, 321 Ark. 621, 623, 906 S.W.2d 674, 675 (1995).

Martin failed to renew his hearsay objection after it was sustained, choosing instead to lodge objections under Ark. R. Evid. 1004, the "best evidence" rule; and Ark. R. Evid. 612, concerning refreshing a witness's recollection. Accordingly, he waived his hearsay challenge to testimony about the contents of the 2006 will. Martin also waited to make a relevancy objection well beyond the first opportunity that occurred during his own testimony. Because Martin failed to preserve his hearsay and relevancy challenges, we affirm.

2. *Testimony about expenditures of money*

Martin next argues that the circuit court abused its discretion by allowing testimony concerning withdrawals and charges that he made from the joint bank account that Eunice made with Martin and Sonja. According to Martin, the evidence was not relevant to the breaches of fiduciary duty that were alleged in the petition for constructive trust; therefore, the circuit court erred by "consistently" overruling his objections. Because Martin waived this argument by failing to lodge a relevancy objection at his first opportunity, we decline to reach the issue and affirm.

17

Martin testified that there was no cash left in Eunice's estate at the time of the hearing, and to that end, he was examined at some length regarding his control of his mother's money during the period that she suffered her stroke and began living with him and Sonja full time. He was questioned about bank statements demonstrating that from December 20, 2011, until August 21, 2012, the balance of the account decreased from well over $15,000 to just $349. Martin indicated that the money was used to pay the utilities for Eunice's home and to pay Sonja, who had become Eunice's primary caregiver, $500 a week. The money was also used to pay for extra nursing help and, eventually, for a portion of Eunice's nursing-home expenses and legal fees. Martin also claimed that even after her debilitating stroke, Eunice made several debit-card transactions at drive-through restaurants, dollar stores, and Wal-Mart.

Martin's counsel allowed all the foregoing testimony, interjecting three times only to request a page reference; to object to a question that "assum[ed] facts not in evidence;" and to request a break in the proceedings. Indeed, Martin's counsel did not lodge any relevancy objection until Martin's testimony resumed after the break, whereupon she stated the following:

> For the record, Your Honor, I'm going, at this time, interpose an objection to all these questions about spending money because I don't believe those are in the pleadings.

As the objection itself appears to acknowledge, Martin let several questions and answers go by without challenging the relevancy of the testimony. Accordingly, because he waived his relevancy argument by failing to raise it at his first opportunity below, we also decline to reach the merits of this issue. *See Chunestudy*, 2012 Ark. 222, at 9, 408 S.W.3d at 61.

18

## C. Undue Influence

In his final assignment of error, Martin appears to argue that the circuit court clearly erred when it set aside the last will that Eunice executed on May 27, 2010. He argues that the circuit court overlooked important evidence and made several factual errors when it ruled that he failed to rebut the presumption of undue influence that arose as a result of his confidential relationship with Eunice. Because we do not agree that the circuit court clearly erred by finding that Martin failed to rebut the presumption of undue influence, we affirm the circuit court's ruling setting aside the will.

"In a typical will contest, the burden of proving the invalidity of a will due to lack of testamentary capacity, undue influence, or fraud is on the contestant." *Wiseman v. Keeter*, 2018 Ark. App. 302, at 19, 550 S.W.3d 883, 893. If the proponent of the will procures the making of the will, however, "a presumption of undue influence arises, and the burden shifts to the proponent to prove beyond a reasonable doubt that the testator had testamentary capacity and was free from undue influence in executing the will." *Id*. at 19, 550 S.W.3d at 894–95. A rebuttable presumption also arises if a confidential relationship exists between the testator and primary beneficiary, *see id*., and in that instance, the proponent of the will must prove the testator's mental capacity and free will by a preponderance of the evidence. *See id*., at 19–20, 550 S.W.3d at 894.

In this case, Martin agrees that he and his mother were in a confidential relationship as a result of the power of attorney; therefore, a rebuttable presumption of undue influence was warranted. He asserts, however, that he rebutted the presumption by a preponderance of the evidence. We disagree.

19

In *Robinson v. Estate of Robinson*, 2016 Ark. App. 130, 485 S.W.3d 261, this court explained the correlation between evidence of mental capacity and evidence of undue influence. There, we reiterated that

> [t]he questions of mental competency and undue influence are so closely related and interwoven that [this court] considers them together. In a case where the mind of the testator is strong and alert, the facts constituting undue influence would be required to be far stronger than a case in which the mind of the testator is impaired, such as by disease or advancing age. Testamentary capacity means that the testator must be able to retain his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty. The relevant inquiry is not the mental capacity of the testator before or after the challenged will is signed, but rather the level of capacity at the time the will was signed. Undue influence is defined as "not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property." Undue influence may be inferred from the facts and circumstances of the case, and cases involving questions of undue influence will frequently depend on a determination of witness credibility.

2016 Ark. App. 130, at 6, 485 S.W.3d at 265 (internal citations omitted).

The evidence at trial demonstrated that Eunice had already begun to experience some cognitive decline in 2010. While her medical records indicate that she was still capable of managing her own self-care and could "converse in a meaningful manner; recognize familiar faces; find her way home; remember her name; remember where she lives; [and] remember the date," there was other evidence, particularly from Lloyd Jr. and Derrell, demonstrating that she had begun having paranoid hallucinations. While Martin introduced witness testimony that Eunice generally did not appear coerced or intimidated, none of those witnesses addressed the execution of the will or, for that matter, were present when it was executed. Additionally, the primary evidence that Martin offered about the circumstances surrounding the execution of the last will was from Judge Finley, whose testimony the

20

circuit court discounted as "less credible" than the testimony that Lloyd Jr. and Derrell offered. Accordingly, because we defer to the circuit court's superior position on matters of credibility, *see Griffith*, 2018 Ark. App. 122, at 7, 545 S.W.2d at 216, and Martin otherwise failed to rebut the presumption of undue influence by a preponderance of the evidence, we affirm.

## V. *Conclusion*

The circuit court erred by imposing the constructive trust because the claim alleged in the petition, breach of fiduciary duty, is barred by the three-year statute of limitations in section 16-56-105. The circuit court did not clearly err, however, when it determined that Martin failed to rebut the presumption of undue influence that arose with respect to the will admitted into probate. We decline to reach Martin's evidentiary challenges, moreover, because he failed to preserve them for our review with timely and appropriate objections below. Accordingly, we reverse the circuit court's ruling imposing the constructive trust and affirm its ruling setting aside the will.

Affirmed in part; reversed in part.

VIRDEN and KLAPPENBACH, JJ., agree.

*The Alford Firm*, by: *Fredye Long Alford*, for appellant.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, for appellees.